**TROY LTD., a limited partnership, and East Coast Condo Tech, Inc., a corporation**

v.

**John P. RENNA, as Commissioner of New Jersey Department of Community Affairs, James R. Zazzali, New Jersey Attorney General, Beatrice Cohen, Yetta Brody and Elsie Ades, individually and as Class Representatives.**

**Appeal of John P. RENNA, Commissioner of the New Jersey Department of Community Affairs and Irwin I. Kimmelman, Attorney General of New Jersey, in No. 83–5077.**

**Appeal of Beatrice COHEN, Yetta Brody, and Elsie Ades in No. 83–5097.**

Nos. 83–5077, 83–5097.

United States Court of Appeals, Third Circuit.

Argued Dec. 2, 1983.

Decided Jan. 30, 1984.

Morris M. Schnitzer (argued), Newark, N.J., for Troy Ltd., John Kings, Milton Snyder, Morton Weinberg and Stephen Forman.

Stephen R. Spector (argued), Glock & Spector, P.C., Teaneck, N.J., for East Coast Condo Tech, Inc.

Thomas Greelish, Acting Atty. Gen. of N.J., Robert Jaworski (argued), Asst. Atty. Gen. of N.J., Trenton, N.J., James J. Ciancia, Asst. Atty. Gen., Trenton, N.J., Of Counsel, Dennis R. Casale, Deputy Atty. Gen., Trenton, N.J., on the Brief, for John P. Renna and Irwin I. Kimmelman.

Joseph H. Rodriguez, Public Advocate, Dept. of the Public Advocate, Kenneth E. Meiser (argued), Deputy Director, Division of Public Interest Advocacy, Trenton, N.J., for Beatrice Cohen, Yetta Brody and Elsie Ades.

Robert Abrams, Atty. Gen. of the State of New York, R. Scott Greathead, Asst. Atty. Gen. in Charge Real Estate Financing Bureau, Harvey J. Golubock, Lawrence G. Albrecht, Asst. Attys. Gen., New York City, for amicus curiae, The State of New York.

Before GIBBONS and SLOVITER, Circuit Judges, and GREEN, District Judge.*

## OPINION OF THE COURT

GIBBONS, Circuit Judge:

These are appeals, pursuant to 28 U.S.C. § 1292(b) (1976), from an order granting partial summary judgment, 580 F.Supp. 69, declaring that section 14 of the New Jersey Senior Citizens and Disabled Protected Tenancy Act, 1981 N.J.Laws ch. 226,

---

* Hon. Clifford Scott Green, United States District Judge for the Eastern District of Pennsyl- vania, sitting by designation.

§ 14 (codified at N.J.Stat.Ann. § 2A:18–61.11(d) (West Supp.1983)) (hereafter the "Tenancy Act"), violates the impairment of contracts and taking clauses of the United States Constitution. The plaintiffs are owners of interests in an apartment complex in Springfield, New Jersey affected by that Act. The defendants are the Commissioner of the New Jersey Department of Community Affairs, the Attorney General of New Jersey, and three tenants in the apartment complex who may be protected by the Tenancy Act.

We hold that the Tenancy Act does not violate the impairment of contracts or taking clause of the United States Constitution. Accordingly, we reverse.

## I. Legislative Background

New Jersey regulates its rental housing stock through a comprehensive set of statutes. This discussion begins with an examination of the rental housing legislation in place before 1981 and then moves on to a discussion of the provisions of the Senior Citizens and Disabled Protected Tenancy Act that are in issue here.

1. The Anti-Eviction Act prohibited evictions except upon establishment of one of the following grounds as good cause:
    a. The person fails to pay rent due and owing under the lease . . .
    b. The person has continued to be, after written notice to cease, so disorderly as to destroy the peace and quiet of the occupants or other tenants . . .
    c. The person has willfully or by reason of gross negligence caused or allowed destruction, damage or injury to the premises;
    d. The person has continued, after written notice to cease, to substantially violate or breach any of the landlord's rules and regulations . . .
    e. The person has continued, after written notice to cease, to substantially violate or breach any of the covenants or agreements contained in the lease . . .
    f. The person has failed to pay rent after a valid notice to quit and notice of increase of said rent, provided the increase in rent is not unconscionable. . .
    g. The landlord or owner (1) seeks to permanently board up or demolish the premises because he has been cited by local or State housing inspectors for substantial violations affecting the health and safety of tenants . . .

### A. Prior Legislation

Until 1981, tenants in New Jersey were protected from eviction by provisions of the New Jersey Anti-Eviction Act, 1974 N.J. Laws ch. 49 (codified, as amended by 1975 N.J.Laws ch. 311, at N.J.Stat.Ann. §§ 2A:18–61.1 to 61.12 (West Supp.1983)). That Act authorized evictions on thirteen prescribed grounds.[1] One of these grounds was a conversion by the owner from rental housing to condominium form of ownership. N.J.Stat.Ann. § 2A:18–61.1(k) (West Supp. 1983). Eviction for that purpose, however, required that the owner satisfy several conditions.

An owner converting to condominium ownership must have served a notice of termination three years before the institution of any action for eviction. No action could be instituted until the existing lease expired. N.J.Stat.Ann. § 2A:18–61.2(g) (West Supp.1983). Thus, the Act essentially contained a three-year minimum grace period before eviction. Tenants receiving a three-year notice could, during the eighteen months following its receipt, request that the owner offer to the tenant "the rental of

h. The owner seeks to retire permanently the residential building . . .
    i. The landlord or owner proposes, at the termination of a lease, reasonable changes of substance in the terms and conditions of the lease . . . which the tenant, after written notice, refuses to accept; . . .
    j. The person, after written notice to cease, has habitually and without legal justification failed to pay rent which is due and owing;
    k. *The landlord or owner of the building . . . is converting from the rental market to a condominium . . .*
    l. (1) The owner . . . has contracted to sell [a condominium] unit to a buyer who seeks to personally occupy it and the contract for sale calls for the unit to be vacant at the time of closing [and the tenancy began after the condominium plan was recorded] . . .
    m. The landlord or owner conditioned the tenancy upon and in consideration for the tenant's employment by the landlord or owner as superintendent, . . . and such employment is being terminated.
N.J.Stat.Ann. § 2A:18–61.1 (West Supp.1983) (emphasis added).

comparable housing...." N.J.Stat.Ann. § 2A:18–61.11(a) (West Supp.1983). Unless the owner located and offered comparable housing, New Jersey courts having jurisdiction over eviction actions were authorized to issue up to five one-year stays of eviction. *Id.* In practice, therefore, if the owner could not locate comparable housing for the tenant, the grace period before eviction could be extended from three to eight years. After the first stay of eviction, however, the owner could prevent further stays by paying to the tenant a "hardship relocation compensation" equal to five months' rent. N.J.Stat.Ann. § 2A:18–61.11(c) (West Supp.1983). Therefore, after the fourth year following a termination notice—three years plus one stay—owners who could not locate comparable housing were faced with a choice: either they could make a payment to the tenant equal to five months' rent, and thereby prevent additional stays of eviction; or they could make no such payment and continue receiving rent from the tenant for up to four more years.

In addition to the Anti-Eviction Act, several New Jersey statutes governed the conversion of real property to the condominium form of ownership. The New Jersey Condominium Act, 1969 N.J.Laws ch. 257 (codified at N.J.Stat.Ann. §§ 46:8B–1 to 30 (West Supp.1983)), provided for conversion of real property to the condominium form by the filing of a master deed meeting certain statutory requirements. N.J.Stat. Ann. § 46:8B–8 (West Supp.1983). When such a master deed is filed, each unit becomes a separate interest in real property. N.J.Stat.Ann. § 46:8B–4 (West Supp.1983). New Jersey also authorized the sale by con-

dominium developers of units created by the filing of a master deed. *See* The Planned Real Estate Development Full Disclosure Act, 1977 N.J.Laws ch. 419 (codified at N.J.Stat.Ann. §§ 45:22A–21 to 42 (West Supp.1983)). The Disclosure Act required that a public offering statement be filed with the New Jersey Department of Community Affairs. N.J.Stat.Ann. § 45:22A–28 (West Supp.1983). The Act also authorized the Community Affairs Department to investigate a developer's application, and to register that application upon finding that the developer is likely to comply with the terms of the public offering statement. N.J.Stat.Ann. §§ 45:22A–29–30 (West Supp.1983). The developer's right to offer units for sale to the public was qualified, however, by a provision of the Anti-Eviction Act requiring that tenants must be afforded notice of their option to purchase the units they occupy. N.J.Stat.Ann. § 2A:18–61.8 (West Supp.1983).

## B. The Tenancy Act

On July 27, 1981, the New Jersey Legislature enacted the Tenancy Act. The Act's purpose is to enhance the protection of certain senior citizens and disabled persons against evictions resulting from condominium conversions. Legislative findings in the Act recite that the "forced eviction and relocation of elderly persons from their established homes and communities harm the mental and physical health of these senior citizens, . . . affect adversely the social, economic and cultural characteristics of communities of the State, and increase the costs borne by all State citizens ...."[2] Al-

---

2. Because the significance of the state interest in regulation is pertinent to our analysis, we set forth these legislative declarations and findings in full:

The Legislature finds that research studies have demonstrated that the forced eviction and relocation of elderly persons from their established homes and communities harm the mental and physical health of these senior citizens, and that these disruptions in the lives of older persons affect adversely the social, economic and cultural characteristics of communities of the State, and increase the costs borne by all State citizens in providing

for their public health, safety and welfare. These conditions are particularly serious in light of the rising costs of home ownership, and are of increasing concern where rental housing is converted into condominiums or cooperatives which senior citizens on fixed limited incomes cannot afford, an occurrence which is becoming more and more frequent in this State under prevailing economic circumstances. The Legislature, therefore, declares that it is in the public interest of the State to avoid the forced eviction and relocation of senior citizen tenants wherever possible, specifically in those instances where

though these appeals concern challenges only to Section 14 of the Tenancy Act, various provisions of the Act are interrelated. These provisions fall into three categories: those sections creating a "protected tenancy period"; a section governing rent increases during that period; and a retroactivity section.

### 1. Protected Tenancy Period

At the heart of the Tenancy Act is a provision in section 4 granting a "protected tenancy status" to "eligible" senior citizens and disabled tenants.[3] Section 3 provides that an eligible "senior citizen tenant" is a tenant in a complex of five or more units who was at least 62 years of age on the date of recordation of the master condominium deed, and who occupied a unit as a principal residence for the prior two years, or who is the surviving spouse of such a tenant. N.J.Stat.Ann. § 2A:18–61.24(a), (f) (West Supp.1983). A recent amendment to this section now provides that an eligible surviving spouse must be at least 50 years of age at the time of the condominium conversion. 1983 N.J.Laws ch. 389 (approved Dec. 2, 1983). An eligible "disabled tenant" is a tenant who, on the date of the conversion, was "totally and permanently unable to engage in any substantial gainful activity by reason of any medically determi-

nable physical or mental impairment, including blindness ...." N.J.Stat.Ann. § 2A:18–61.24(b) (West Supp.1983).

Eligible tenants may apply under section 7 to an administrative agency for "protected tenancy status" on or before the date of registration of conversion. These tenants qualify for protected tenancy status if their annual household income does not exceed three times the county per capita personal income level. N.J.Stat.Ann. § 2A:18–61.-28(c) (West Supp.1983). The "protected tenancy period" conferred by the Act on qualified tenants continues for forty years after the date of conversion. N.J.Stat.Ann. § 2A:18–61.24(h) (West Supp.1983). No action for eviction may be brought against protected tenants during this period. N.J. Stat.Ann. § 2A:18–61.1(k) (West Supp. 1983). Thus, the effect of qualifying for a protected tenancy is to obtain the right to remain as a tenant in a converted unit for up to forty years beyond any period already authorized by the Anti-Eviction Act. A protected tenancy status may also be terminated. Section 11 of the Act provides that protected status shall be terminated if the unit is no longer the principal residence of the protected tenant, or if the annual household income of the protected tenant exceeds three times the most recently reported county per capita personal income

rental housing market conditions and particular financial circumstances combine to diminish the ability of senior citizens to obtain satisfactory comparable housing within their established communities, and where the eviction action is the result not of any failure of the senior citizen tenant to abide by the terms of a lease or rental agreement, but of the owner's decision advantageously to dispose of residential property through the device of conversion to a condominium or cooperative.

The Legislature further finds that it is in the public interest of the State to avoid the forced eviction and the displacement of the handicapped wherever possible because of their limited mobility and the limited number of housing units which are suitable for their needs.

The Legislature further declares that in the service of this public interest it is appropriate that qualified senior citizen tenants and disabled tenants be accorded a period of protected tenancy, during which they shall be

entitled to the fair enjoyment of the dwelling unit within the converted residential structure, to continue for such time, up to 40 years, as the conditions and circumstances which make necessary such protected tenancy shall continue.

The Legislature further finds that the promotion of this public interest is possible only if senior citizen tenants and disabled tenants are protected during this period from alterations in the terms of the tenancy or rent increases which are the result solely of an owner's decision to convert.

N.J.Stat.Ann. § 2A:18–61.23 (West Supp.1983).

3.  Section 4 provides:

Each eligible senior citizen tenant or disabled tenant shall be granted a protected tenancy status with respect to his dwelling unit whenever the building or structure in which that unit is located shall be converted....

N.J.Stat.Ann. § 2A:13–61.25 (West Supp.1983).

level.  N.J.Stat.Ann. § 2A:18–61.32 (West Supp.1983).

### 2. Rent Increases During Protected Tenancy

The Tenancy Act also governs the magnitude of rent increases that developers may charge in order to recoup condominium conversion costs.  Section 10 of the Act provides that in a municipality without a rent control ordinance in effect, the owner cannot use increased costs due to conversion as a justification for the conscionability of a rent increase in a suit for nonpayment of rent.[4]  N.J.Stat.Ann. § 2A:28–61.31 (West Supp.1983).  In municipalities with rent control ordinances in effect, the impact of the Tenancy Act is slightly different.  In these communities, increased costs due to conversion cannot be used to justify a rent increase in a "fair return or hardship hearing" before a municipal rent board.  *Id.*  The Township of Springfield, New Jersey has such a rent control ordinance.  That ordinance currently authorizes rent increases of six and one-half percent per year, subject to a number of adjustments.  Two such adjustments authorize increases in "Rate of Return" and "hardship" hearings;[5] in these hearings, evidence of increased costs due to conversion would evidently not be permitted.  Other adjust-

ments—for example, adjustments reflecting increased property taxes—operate automatically, without hearings;  these adjustments would apparently permit the passing on of certain conversion costs.[6]

In sum, the applicable rules in Springfield Township permit a condominium owner to receive yearly rent increases of six and one-half percent from each tenant-occupied condominium during the duration of a protected tenancy, and appear to permit the pass-on of certain condominium conversion costs.

### 3. The Retroactivity Clause

Section 14 of the Tenancy Act permits the retroactive application of the Act in certain circumstances.  That section provides that in any action for a stay of eviction, for declaratory judgment, or in any other proceeding under the Anti-Eviction Act:

> the court *may* invoke *some or all* of the provisions of the [Tenancy Act] and grant to a tenant, pursuant to that [Act], a protected tenancy period upon the court's determination that:
>
> (1) The tenant would otherwise qualify as a senior citizen tenant or disabled tenant ... except that the building or structure in which the dwelling unit is located was converted *prior to the effective date of that [Act]; and*

---

**4.**  One of the thirteen grounds for eviction under the Anti-Eviction Act is nonpayment of rent after the service of a valid notice of rent increase, "provided the increase in rent is not unconscionable ...."  N.J.Stat.Ann. § 2A:18–61.1(f) (West Supp.1983); *see* note 1 *supra.*  Section 10 of the Tenancy Act prohibits the owner's use of increased costs due to conversion as a justification for the conscionability of a rent increase in such a suit for eviction under section 2(f).  Increased conversion costs are those costs that are "solely the result of the conversion," including increased financing or carrying costs, and which "do not add services or amenities not previously provided ...."  N.J.Stat.Ann. § 2A:18–61.31 (West Supp.1983).

**5.**  Section 13.6 of the Springfield ordinance authorizes the landlord to apply for a "Rate of Return" increase if the landlord's ratio of operating expenses to gross rents exceeds 60 percent.  Section 13.5 authorizes the landlord to apply for a "hardship increase" "[i]n the event that a landlord cannot meet his current ex-

penses for mortgage payments, and-or maintenance or repairs and-or heat-utility expenses ...."  App. at 56.

**6.**  *Section 13.3.1 authorizes certain capital improvement adjustments.  Section 13.4 authorizes the landlord to "seek a tax surcharge from a tenant because of an increase in municipal property taxes."  App. at 56.  Evidently, neither of these adjustments occurs in a "fair return" or "hardship" hearing.  Defendants argue that because section 10 of the Tenancy Act proscribes the passing on of conversion costs in a "fair return or hardship" hearing only, it would have no impact on forms of automatic rent adjustment, including the property-tax pass-through.  See* App. at 54.  Plaintiffs dispute this interpretation of section 10, maintaining that the section forbids any recovery of condominium costs that do not add to the services or amenities of the buildings.  Because the issue is not outcome determinative, we have no occasion to pass on this question.

(2) The granting of the protected tenancy period as applied to the tenant, giving particular consideration to whether a unit was sold on or before the date that the [Act] takes effect to a bona fide individual purchaser who intended personally to occupy the unit, would not be violative of concepts of fundamental fairness or due process.

N.J.Stat.Ann. § 2A:18–61.11(d) (West Supp. 1983) (emphasis added). The effect of section 14 is to confer upon the New Jersey courts discretionary authority to recognize a protected tenancy status for certain senior citizens, their spouses, and certain disabled persons who could otherwise have been evicted under the Anti-Eviction Act on three years' notice plus the tender of comparable rental housing or hardship relocation compensation.

If a court declines to grant protected tenancy status, it may nonetheless authorize up to five one-year stays of eviction until comparable rental housing is provided. The owner does not, however, have the option to buy out the interest of the tenant with a "hardship relocation compensation" of five months' rent. *Id.*

## II. Facts and Proceedings in the District Court

Troy Hills of Springfield is a garden apartment complex consisting of 342 residential units. Troy, Ltd. ("Troy") purchased the complex on October 1, 1979. At that time, the complex was occupied by rental tenants. On January 31, 1980, Troy contracted to sell the complex to East Coast Condo Tech, Inc. ("East Coast"), and to take back mortgages on the individual units that would be created by a condominium conversion. On February 28, 1980, Troy filed a master condominium deed, converting its ownership from a single fee to a number of condominium units. East Coast then filed a prospectus with the Department of Community Affairs, which the Department approved, pursuant to the Planned Real Estate Full Disclosure Act, in October of 1980. In January of 1981, East Coast served the three-year notices of eviction required by the Anti-Eviction Act on all tenants in the complex. The Troy-to-East-Coast closing took place on June 28, 1981, one month before the effective date of the Tenancy Act. East Coast became the owner of the separate units; Troy became the mortgagee of those units.

Many units were sold pursuant to the approved prospectus. Among the purchasers of these units are the four individual plaintiffs in this action, John F. King, Jr., Milton Snyder, Morton Weinberg, and Stephen Forman. Weinberg and Forman executed sales contracts for condominiums before the effective date of the Tenancy Act, but closed these sales after its effective date. King and Snyder both executed sales contracts and closed sales after the Act's effective date.

On November 6, 1981, Troy and East Coast filed this action seeking declaratory and injunctive relief against the enforcement of the Tenancy Act. The complaint named as defendants the New Jersey Community Affairs Commissioner and the Attorney General (the "state defendants") and three tenants who were alleged to claim benefits under the Act as senior citizens (the "tenant defendants"). Counts I and II challenged the rent-control and protected-tenancy provisions of the Act in their prospective application. Count III of the complaint attacked the retroactive operation of section 14. That count averred that section 14 constitutes an impairment of contract, and a taking of property without just compensation, in a variety of respects, principally by aborting the sale of condominium units occupied by tenants who qualify for a protected status, and by denying to the owners of these units "the recovery of the costs of operation and a fair return upon the value of the units." Compl. ¶ 32, App. at 31–32. Count III also alleged a diminution in the value of the complex as security for any mortgage, and an impairment of the ability to obtain further financing on these units. *Id.*

At the time plaintiffs filed this complaint, the tenant-defendants had not obtained court orders declaring that they

qualified for protected tenancy status. Arguing that the district court should not proceed without such a determination, the tenant-defendants filed a motion for abstention on April 10, 1982. The district court denied that motion on April 26. On May 25, Troy and East Coast moved to add the four individual investor-plaintiffs—King, Snyder, Weinberg, and Forman—and moved for partial summary judgment on due process, equal protection, and taking grounds. The state-defendants cross-moved for summary judgment on July 6. The tenant-defendants also filed a cross-motion for summary judgment seeking to dismiss the complaint "insofar as it alleges that [section 14] is unconstitutional."

On December 13, 1982, the district court entered partial summary judgment on that portion of the complaint alleging that the retroactive operation of section 14 violated the impairment of contract and taking clauses. Reasoning that the alterations authorized by the Act "amount to a serious disruption of the grantee's expectations," the district court held that section 14 violated the impairment of contract clause, as interpreted in *United States Trust Co. v. New Jersey,* 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977). The court also held that because section 14 applied to premises already converted, it violated the federal constitutional prohibition against uncompensated takings, as interpreted in *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982).

The district court's order certified that it involves a controlling question of law as to which there is substantial ground for difference of opinion, and that an immediate appeal from it may materially advance the ultimate termination of the litigation. On January 10, 1983, we granted leave to appeal under 28 U.S.C. 1292(b) (1976). We now reverse.

## III. Impairment of Contract

Article I, section 10 of the United States Constitution prohibits the states from passing a "Law impairing the Obligation of Contracts." Historically, the Supreme Court has analyzed quite differently the operation of that clause on contracts between private parties and states, on the one hand, and on contracts among private parties on the other. The district court's reliance on *United States Trust Co. v. New Jersey,* 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977), requires that we examine this longstanding distinction.

### A.

The contract clause is among those provisions of the Constitution addressing post-Revolutionary War state legislation purporting to repudiate obligations owed by local debtors to British and loyalist creditors. A number of states had, in evident violation of article IV of the 1783 Treaty of Peace, 8 Stat. 80, 82, enacted laws staying the time for payment of debts, making paper money legal tender, and sequestering debts due British creditors. *See Home Building & Loan Ass'n v. Blaisdell,* 290 U.S. 398, 454–61, 54 S.Ct. 231, 246–48, 78 L.Ed. 413 (1934) (Sutherland, J., dissenting); *Sturges v. Crowninshield,* 17 U.S. (4 Wheat.) 122, 204, 4 L.Ed. 529 (1819). Thus, article I, section 10 of the Constitution forbade the states from coining money, emitting bills of credit, making anything but gold and silver coin a tender for the payment of a debt, and "impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1.

Although the contract clause arose from the purported repudiation of contracts between private parties, the Supreme Court held in 1810 that the clause prohibited a state's repudiation of its own contracts as well. *Fletcher v. Peck,* 10 U.S. (6 Cranch) 87, 137–39, 3 L.Ed. 162 (1810). Fidelity to the principle that "one legislature cannot abridge the powers of a succeeding legislature," *id.* at 134, 3 L.Ed. 162, soon, however, led to a relaxation of the rigor with which the Court scrutinized legislation decreasing the value of public contracts. *See, e.g., Charles River Bridge v. Warren Bridge,* 36 U.S. (11 Pet.) 420, 432, 9 L.Ed. 773 (1837) (charter to operate a bridge subject to legis-

lative power to charter a competitor); *Stone v. Mississippi,* 101 U.S. 814, 817–20, 25 L.Ed. 1079 (1880) (state-chartered lottery company rendered valueless by subsequent abolition of lotteries); *Fertilizing Co. v. Hyde Park,* 97 U.S. 659, 667–70, 24 L.Ed. 1036 (1878) (value of state-chartered fertilizer company impaired by ordinance prohibiting transportation of fertilizer).

In contrast, laws alleged to impair the obligations of contracts between private parties were for many years scrutinized far more rigorously. These cases arose principally out of state efforts to provide relief for impecunious debtors. The Court consistently held that any state law retroactively modifying the obligations of debtors violated article I, section 10. *See, e.g., Ogden v. Saunders,* 25 U.S. (12 Wheat.) 212, 261–70, 6 L.Ed. 606 (1827) (Washington, J.); *id.* at 295 (Thompson, J.); *id.* at 326–27 (Trimble, J.); *Green v. Biddle,* 21 U.S. (8 Wheat.) 1, 84–85, 5 L.Ed. 547 (1823) ("[a]ny deviation from its terms . . . however minute, or apparently immaterial . . . impairs its obligation"); *Sturges v. Crowninshield,* 17 U.S. (4 Wheat.) 122, 207, 4 L.Ed. 529 (1819). The Court's doctrine that changes in the law of remedies could amount to an impairment of private contractual obligations placed fairly tight limits on the authority of states to grant relief to debtors by the manipulation of state remedial laws. *See, e.g., Green v. Biddle,* 21 U.S. (8 Wheat.) at 83–85, 5 L.Ed. 547 (lien on land for value of improvements impairs obligation of contract). In this sense, the Supreme Court treated the impairment of contract clause as the obverse of the grant of congressional authority in article I, section 8 of the Constitution to establish uniform laws on the subject of bankruptcies. U.S. Const. art. I, § 8, cl. 4. Congress could, but the states could not, impair the obligation of undertakings by debtors. *See Hanover National Bank v. Moyses,* 186 U.S. 181, 188, 22 S.Ct. 857, 860, 46 L.Ed. 1113 (1902) ("The [Bankruptcy] grant to Congress involves

the power to impair the obligation of contracts, and this the States were forbidden to do.").

In 1934 the Supreme Court took a historic step toward inverting the longstanding dichotomy between public and private contracts. In the significant case of *Home Building & Loan Ass'n v. Blaisdell,* 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934), the Court held that the contract clause should not be read as a serious impediment to state social and economic legislation affecting private contracts. *Blaisdell* examined a Minnesota mortgage moratorium law, enacted as an emergency measure during the great Depression, which extended the redemption period for mortgages. In sustaining the extended redemption period, the Court held for the first time that legislation retroactively affecting the value of an underlying contractual obligation did not violate the contract clause when enacted in pursuit of legitimate economic or social objectives. "The economic interests of the State," the Court held,

> may justify the exercise of its continuing and dominant protective power notwithstanding interference with contracts. . . .
> The question is not whether legislation affects contracts incidentally, or directly or indirectly, but whether the legislation is addressed to a legitimate end and the measures taken are reasonable and appropriate to the end.

290 U.S. at 437–38, 54 S.Ct. at 239–40. The Court characterized the power of economic and social legislation to affect private contractual arrangements as the "reserved power,"[7] and noted that the states' reserved police powers and the contract clause must be construed in harmony with one another:

> This principle precludes a construction which would permit the State to adopt as its policy the repudiation of debts or the destruction of contracts or the denial of means to enforce them. But it does not

---

**7.** The allusion to "reserved power" evidently harkened to the concurring opinion of Justice Story in *Trustees of Dartmouth College v. Woodward,* 17 U.S. (4 Wheat.) 518, 712, 4 L.Ed.

629 (1819) (Story, J., concurring) (right to restrain corporate power must be reserved in charter).

follow that conditions may not arise in which a temporary restraint of enforcement may be consistent with the spirit and purpose of the constitutional provision and thus be found to be within the range of the reserved power of the State to protect the vital interests of the community.

*Id.* at 439, 54 S.Ct. at 240. In subsequent cases, the Court enlarged the degree of deference accorded to state economic and social legislation affecting private contract rights. *E.g., Veix v. Sixth Ward Building & Loan Ass'n,* 310 U.S. 32, 37–39, 60 S.Ct. 792, 794–795, 84 L.Ed. 1061 (1940) (sustaining permanent legislation limiting withdrawal of funds from savings and loan associations); *East New York Savings Bank v. Hahn,* 326 U.S. 230, 233–35, 66 S.Ct. 69, 70–71, 90 L.Ed. 34 (1945) (approving tenth extension of mortgage moratorium). Under these post-*Blaisdell* authorities, the contract clause placed only limited inhibitions on the ability of state legislatures to address significant social problems by legislation affecting existing contractual undertakings between private parties.

In 1977, the Court completed the inversion begun in *Blaisdell* of its analyses of public and private contracts. In *United States Trust Co. v. New Jersey,* 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977), the Supreme Court struck down state legislation repealing a covenant between the state of New Jersey and its bondholders pledging to limit mass transit deficits to a percentage of cash reserves and revenues of the transit authority. *United States Trust* was thus one of the long line of cases stretching back to *Fletcher v. Peck,* 10 U.S. (6 Cranch) 87, 3 L.Ed. 162 (1810), addressing efforts by the states to repudiate by subsequent legislation their own contractual undertakings. Despite early deference to such legislation, the Supreme Court in *United States Trust* applied a higher standard of scrutiny to state abrogations of their own contractual arrangements than to state efforts to modify purely private agreements. The Court reasoned that when the state is a party to the contract, "complete deference to a legislative assessment of reasonableness and ne-

cessity is not appropriate because the State's self-interest is at stake." 431 U.S. at 26, 97 S.Ct. at 1519. In these cases, the Court held, it would apply a more exacting standard of scrutiny, examining whether "a less drastic modification would have" sufficed and whether the modification was reasonable in light of changed circumstances. *Id.* at 30–32, 97 S.Ct. at 1521–1522.

It is evident, therefore, that the district court erred in relying on *United States Trust Co. v. New Jersey.* That case is one of many from age to age dealing with the abrogation of contractual terms between a state and private parties. The higher standard of *United States Trust* is not relevant to the disposition of this case, which poses the very different problem of legislation allegedly impairing the obligation of contracts between private parties. The appropriate line of authority for this issue is that of *Home Building & Loan Ass'n v. Blaisdell* and its progeny, and it is to that line of cases that we now turn.

### B.

The most recent authority in the line of cases addressing state legislation affecting private contracts is the Supreme Court's decision last term in *Energy Reserves Group, Inc. v. Kansas Power and Light Co.,* —— U.S. ——, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983). In *Energy Reserves,* the Court considered an impairment-of-contracts challenge to a Kansas statute imposing price ceilings on newly discovered gas. These price ceilings were lower than those which would otherwise have been charged under a long-term supply contract. Justice Blackmun's opinion for a unanimous Court is significant in several respects. First, the Court reiterated the distinction, noted above, between the level of scrutiny applicable under *United States Trust Co.* to impairments when the state itself is a contracting party, and the level of scrutiny applied to other economic and social legislation. 103 S.Ct. at 705–06 & n. 14. Second, the Court drew the analyses of its prior cases into a three-step investigation.

■ The threshold inquiry is whether the state law has operated " 'as a substantial impairment of a contractual relationship.' " *Id.* at 704–05, quoting *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 244, 98 S.Ct. 2716, 2722, 57 L.Ed.2d 727 (1978).[8] If the state law is found to be a "substantial impairment," then a second inquiry is required: "the State, in justification, must have a significant and legitimate public purpose behind the regulation . . . such as the remedying of a broad and general social or economic problem." *Id.* 103 S.Ct. at 705. Finally, if such a legitimate public purpose is identified, a third query is posed: "the next inquiry is whether the adjustment of 'the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption.' " *Id.,* quoting *United States Trust Co.,* 431 U.S. at 22, 97 S.Ct. at 1517. It is at this third stage that the distinction introduced in *United States Trust* enters:

> Unless the State itself is a contracting party, . . . "[a]s is customary in reviewing economic and social regulation, . . . courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure."

*Energy Reserves Group,* 103 S.Ct. at 705–06, quoting *United States Trust Co.,* 431 U.S. at 22–23, 97 S.Ct. at 1517–1518.

### 1. Substantiality of the Impairment

■ We have no doubt that the 1981 Tenancy Act passes muster under the contract clause as interpreted in *Energy Reserves Group.* First, it is doubtful that *any* impairment of a contractual relationship has occurred. The Tenancy Act only enlarged, for senior citizens and the disabled, a preexisting statutory tenancy which came into operation as a matter of law. Prior to the enactment of the Tenancy Act, New Jersey had already placed significant limitations upon the rights of owners of multiple dwellings to define the landlord-tenant relationship solely in terms of contract. The 1974 Anti-Eviction Act, which is not here challenged, provided that tenants could not be evicted, except for designated causes not relevant here, during the contractual term of a lease. *See* note 1 *supra.* Moreover, the Act mandated an eight-year extension of the lease—or a four-year extension coupled with a "hardship compensation payment"—if the landlord did not offer the tenant comparable housing. N.J. Stat.Ann. § 2A:18–61.2(g) (West Supp. 1983). Thus, beginning in 1974 the terms of the landlord-tenant relationship were specified to a large extent by statute. The Tenancy Act only operates to protect those statutory tenants whose relationship with their landlord has already become non-consensual by virtue of the Anti-Eviction Act. That is, the Tenancy Act simply enlarges the terms of a statutory tenancy already created by the Anti-Eviction Act. All of the plaintiffs acquired their interests in the Springfield complex after the Anti-Eviction Act went into effect. Such an enlargement of an already-regulated statutory tenancy is probably not an impairment at all. As the Supreme Court held in *Veix v. Sixth Ward Building & Loan Ass'n,* 310 U.S. 32, 38, 60 S.Ct. 792, 794, 84 L.Ed. 1061 (1940), "[w]hen he purchased into an enterprise already regulated in the particular to which he now objects, he purchased subject to further legislation upon the same topic."

Even if that statutory tenancy is deemed to fall within the coverage of the impairment clause, however, we have no doubt that its extension, beyond the eight years already provided in the Anti-Eviction Act, is not "substantial." Most eligible tenants

---

**8.** Drawing on the line of authority beginning with *Blaisdell,* the Court held:

> The severity of the impairment is said to increase the level of scrutiny to which the legislation will be subjected. . . . Total destruction of contractual expectations is not necessary for a finding of substantial impairment. . . . On the other hand, state regula-

tion that restricts a party to gains it reasonably expected from the contract does not necessarily constitute a substantial impairment. . . . In determining the extent of the impairment, we are to consider whether the industry the complaining party has entered has been regulated in the past.

103 S.Ct. at 705 (citations omitted).

**298**

are by definition 62 years of age at the date of the conversion (or, if surviving spouses, 50 years of age). These tenants would be 70 years of age (or, if surviving spouses, 58 years of age) at the conclusion of the eight-year Anti-Eviction period. During any addition to this period, the owner is entitled to rent increases authorized under local law, here six and one-half percent per year. The owner may still evict for the other reasons enumerated in note 1, *supra.* The extended tenancy ends if the tenant ceases to make the unit the principal residence. Under these conditions, if the Act constitutes an impairment at all, it is not a "substantial" one.[9]

### 2. Legitimacy and Reasonableness of Public Purpose

Assuming, however, that the plaintiffs had actually satisfied the *Energy Reserves* threshold requirement by showing a substantial impairment, there is no question but that the state has justified it by showing a broad remedial purpose in protecting the mental and physical health of citizens who could suffer greatly by evictions. The legislative findings expressly report that the relocation of elderly and disabled persons is disruptive, costly for themselves and for the state in general, and particularly injurious for these persons who are often limited to fixed incomes. N.J.Stat.Ann. § 2A:18–61.23 (West Supp.1983); *see* note 2 *supra.*

In assessing the reasonableness of these purposes, we are admonished not to substitute our views for those of the legislature. Because the state is not itself a contracting party, in this sphere of economic and social regulation we "properly defer to legislative judgment as to the necessity and reasonableness of" the Act. *Energy Reserves Group,* 103 S.Ct. at 706. Moreover, here the availability of a protected tenancy depends upon a reasonable personal income test,

N.J.Stat.Ann. § 2A:18–61.28(c) (West Supp. 1983), and is in any event subject to the exercise of discretion by the New Jersey Courts. Those Courts are directed to consider "fundamental fairness" in deciding to confer "some or all" of the Act's protections to eligible tenants. In light of these considerations, the 1981 Tenancy Act amply satisfies the requirement of a legitimate and reasonable public purpose.

### C.

Finally, the plaintiffs rely on *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978), urging that *Allied* represents a significant reinterpretation of the impairment clause. In *Allied,* the Court examined a Minnesota pension law requiring corporations that closed their offices in Minnesota, and nowhere else, to purchase annuities for former employees whose pensions had not yet vested under a company pension plan. Holding that the Act's retroactive application violated the contract clause, Justice Stewart wrote for the Court:

Entering a field it had never before sought to regulate, the Minnesota Legislature grossly distorted the company's existing contractual relationships with its employees by superimposing retroactive obligations upon the company substantially beyond the terms of its employment contracts. And that burden was imposed upon the company only because it closed its office in the State.

This Minnesota law simply does not possess the attributes of those state laws that in the past have survived challenge under the Contract Clause of the Constitution. The law was not even purportedly enacted to deal with a broad, generalized economic or social problem.... It did not operate in an area already subject to state regulation at the time the company's contractual obligations were origi-

**9.** We note that our analysis does not turn on the nature of the plaintiff's ownership interest as a "condominium" or a single fee simple. The impact of legislation affecting the condominium form of ownership is no different than if the same statutory tenancy had been imposed on the form of fee ownership existing before the conversion. The question is whether the creation of the protected tenancies here involved amounted to an impairment of the obligation of contract, regardless of the nature of the underlying fee ownership.

nally undertaken, but involved an area never before subject to regulation by the State.... It did not effect simply a temporary alteration of the contractual relationships of those within its coverage, but worked a severe, permanent, and immediate change in those relationships—irrevocably and retroactively.... And its narrow aim was leveled, not at every Minnesota employer, not even at every Minnesota employer who left the State, but only at those who had in the past been sufficiently enlightened as voluntarily to agree to establish pension plans for their employees.

438 U.S. at 249–50, 98 S.Ct. at 2724–25 (citations omitted).

Justice Stewart's language in *Spannaus* evidently evinces less deference to state economic policy decisions affecting private contracts than do the opinions which intervened between *Spannaus* and *Blaisdell.* Nevertheless, we do not believe the *Spannaus* case furthers the plaintiffs' cause. The *Spannaus* Court relied upon a combination of circumstances not presented by the Tenancy Act. *Spannaus* deals with the modification of an existing contractual relationship voluntarily arrived at by negotiation between employer and employee. The Tenancy Act, in contrast, involves the modification of the terms of a non-contractual statutory tenancy previously imposed by state law. In *Spannaus,* the Minnesota legislature entered a field it had never before sought to regulate; New Jersey, to the contrary, regulated statutory tenancies following the expiration of a contractual lease beginning in 1974, and the plaintiffs purchased subject to those limitations. The Minnesota legislation, as described by Justice Stewart, did not address a broad generalized social problem. Indeed, there were indications that the legislation intended to single out "a small number of employers ... from the larger group." *Energy Reserve Group,* 103 S.Ct. at 708 n. 25. Here the legislative findings and affidavits on file establish that New Jersey—both in the 1974 Anti-Eviction Act and in the 1981 Ten-

ancy Act—dealt with a generalized, extremely serious housing shortage caused by the unavailability of mortgage funds, which placed great economic pressure on owners of rental property to capitalize on that shortage by converting to condominium ownership. Finally, Minnesota singled out the pension contract obligations of employers leaving that state. New Jersey, on the other hand, excluded from the coverage of the Anti-Eviction Act and the Tenancy Act only multiple dwellings with fewer than five units. The Act thereby "imposed a generally applicable rule of conduct designed to advance a broad societal interest." *Exxon Corp. v. Eagerton,* —— U.S. ——, 103 S.Ct. 2296, 2306, 76 L.Ed.2d 497 (1983).

For these reasons, we do not agree that the 1981 Senior Citizens and Disabled Protected Tenancy Act constitutes an impairment of the obligation of contract. Thus, the summary judgment holding section 14 unconstitutional, insofar as it rested on article I, section 10, cannot stand.

### IV. The Taking Clause

It has long been settled that " 'since the adoption of the Fourteenth Amendment compensation for private property taken for public uses constitutes an essential element in 'due process of law,' and that without such compensation the appropriation of private property to public uses, no matter under what form of procedure it is taken, would violate the provisions of the Federal Constitution.' " *Chicago, B. & Q.R.R. v. Chicago,* 166 U.S. 226, 239, 17 S.Ct. 581, 585, 41 L.Ed. 979 (1897), quoting *Scott v. City of Toledo,* 36 F. 385, 396 (C.C.N.D.Ohio 1888). It has also been long settled that not every governmental regulation of the uses to which private property may be put is a taking for public use. *See Miller v. Schoene,* 276 U.S. 272, 277–80, 48 S.Ct. 246, 72 L.Ed. 568 (1928) (statute authorizing destruction of diseased cedar trees); *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 386–95, 47 S.Ct. 114, 117–21, 71 L.Ed. 303 (1926) (industrial zoning regulation).[10]

10. *See Andrus v. Allard,* 444 U.S. 51, 65, 100 S.Ct. 318, 326, 62 L.Ed.2d 210 (1979):

The line between permissible police power regulations and impermissible uncompensated takings for public use has not always been easy to discern. In three recent decisions, the Court rejected challenges alleging takings without just compensation. *See Agins v. City of Tiburon,* 447 U.S. 255, 260–63, 100 S.Ct. 2138, 2141–42, 65 L.Ed.2d 106 (1980), *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 122–38, 98 S.Ct. 2646, 2658–66, 57 L.Ed.2d 631 (1978); *Goldblatt v. Town of Hempstead,* 369 U.S. 590, 592–94, 82 S.Ct. 987, 989–90, 8 L.Ed.2d 130 (1962). In *Loretto v. Teleprompter Manhattan C.A.T.V. Corp.,* 458 U.S. 419, 425–41, 102 S.Ct. 3164, 3170–79, 73 L.Ed.2d 868 (1982), in contrast, the Court sustained such a challenge. The district court concluded that *Loretto,* rather than *Agins, Penn Central* and *Goldblatt,* controlled. We disagree.

### A.

■ The difficulty which sometimes arises in determining when an uncompensated-taking analysis is appropriate arises out of the failure of courts and litigants to recognize that there is no federal constitutional prohibition against takings, as such. Rather, the Constitution proscribes takings for public use "without just compensation." If adequate compensation is afforded, and if the challenged legislation has a sufficient public purpose to satisfy the demands of equal protection and substantive due process, then it is valid despite the fact that it may change the incidents of ownership in, or even the possession of, private property. *See O'Neill v. Leamer,* 239 U.S. 244, 248, 251–54, 36 S.Ct. 54, 56, 57–58, 60 L.Ed. 249 (1915) (adequate compensation scheme

available; challenge rejected on substantive due process grounds).

■ Thus, the fact that the Tenancy Act creates a statutory tenancy for senior citizens and disabled persons that may amount to a "taking" could not, alone, be dispositive of its constitutionality. Both the Anti-Eviction Act and the Tenancy Act provide for compensation to the owner in the form of rent.[11] Until the district court analyzes the compensation features of the statutory scheme to determine whether the level of compensation is adequate, it cannot find an uncompensated taking. No such analysis was made in this case. Indeed, on the summary judgment record on which the court acted, none could be made.

■ The Supreme Court's recent holding in *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982), does not compel a different conclusion. *Loretto* addressed the constitutionality of a New York statute requiring owners of rental properties to permit the installation of facilities for cable television transmission owned by cable franchise holders. In that case, the New York Court of Appeals had held that no taking had occurred and had entered judgment for the defendants. The Supreme Court reversed, but remanded for a determination of the question whether the amount of compensation to the owner provided under the New York statutory scheme was adequate. *Id.* at 441, 102 S.Ct. at 3179. Thus, *Loretto* does not stand for the proposition that an uncompensated-taking challenge to a statute providing for some form of compensation may be decided, in favor of the party challenging the stat-

[G]overnment regulation—by definition—involves the adjustment of rights for the public good. Often this adjustment curtails some potential for the use or economic exploitation of private property. To require compensation in all such circumstances would effectively compel the government to regulate by *purchase.* "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." *Pennsylvania Coal Co. v. Mahon,* 260 U.S.

393, 413, 43 S.Ct. 158, 159, 67 L.Ed. 322 (1922)[.]

11. *Loss of income must be accounted for in awarding "just compensation." See, e.g., Backus v. Fort Street Union Depot Co.,* 169 U.S. 557, 572–75, 18 S.Ct. 445, 451–52, 42 L.Ed. 853 (1898). Similarly, the existence of income or other economic benefits must be considered in evaluating whether just compensation has been provided. *See, e.g., United States v. Sponenbarger,* 308 U.S. 256, 266–67, 60 S.Ct. 225, 229, 84 L.Ed. 230 (1939).

ute, facially without a record. It is clear from the remand in *Loretto* that if the compensation owed by cable franchisees to the owners proved to be adequate, then the New York statute would be constitutional. Plainly, therefore, the summary judgment that section 14 of the Tenancy Act is facially unconstitutional cannot stand.

### B.

The appellants also urge that the order appealed from must be reversed because, apart from the absence of findings on "just compensation," the Tenancy Act does not entail a "taking for public use." Instead, they maintain, the Act is a classic economic or social regulation falling outside the ambit of the prohibition against uncompensated takings for public uses. Because this issue may obviate the necessity to determine the factual question of whether the provision for payment of rent amounts to just compensation, the issue is "a controlling question of law" which "may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b) (1976). That being the case, we reach it.

In *Loretto,* the Supreme Court held that a "permanent physical occupation of property is a taking." 458 U.S. at 441, 102 S.Ct. at 3179. The Tenancy Act is clearly not a taking of property under the *Loretto* standard of permanency. Most tenants with a protected status will be 70 years of age (or, if surviving spouses, 58 years of age) before the Tenancy Act comes into play. It is fanciful to imagine that these tenants will occupy their units "permanently." Moreover, the tenancies may terminate by virtue of changing income levels or principal residences, and tenants may be evicted on any of thirteen grounds. *See* note 1 *supra*. Finally, the *Loretto* Court itself distinguished state housing legislation authorizing an extension of the tenant's lease. 458 U.S. at 440, 102 S.Ct. at 3178, citing *Edgar A. Levy Leasing Co. v. Siegel,* 258 U.S. 242, 246–48, 42 S.Ct. 289, 291–92, 66 L.Ed. 595 (1922), and *Block v. Hirsh,* 256 U.S. 135, 153–58, 41 S.Ct. 458, 459–60, 65 L.Ed. 865 (1921). "In none of these cases," the Court held, "did the government authorize the permanent occupation of the landlord's property by a third party." *Id.* Under these circumstances, the Tenancy Act obviously does not fall within the proscription of *Loretto.*

We also hold that the Tenancy Act is not a taking for a "public use."[12] The installation at issue in *Loretto* is the exemplar of a public use. The challenged New York law authorized an occupation of private property by a common carrier, Teleprompter, engaged in a classic public utility function.[13] The carrier's installation of "crossover" and "noncrossover" cables on the plaintiff's roof, 458 U.S. at 422, 102 S.Ct. at 3180, afforded broadcasters a common means of communication with tenants in the plaintiff's building and in the adjacent area. Consequently, *Loretto* cannot reasonably be read without an awareness of the public use involved in the taking. *Loretto* plainly does not hold that a "permanent physical occupation" is a taking without regard for the public use of the property.

◼ Moreover, *Loretto* itself confirmed the age-old distinction between regulation and public use.[14] Writing for the Court,

---

**12.** "Public use" under the taking clause must be distinguished from "public purpose" as that term is used under the contract clause or in analyzing the scope of the police power. Public uses include, for example, physical occupation by a common carrier engaged in a classic public utility function. *See* note 16 *infra.*

**13.** *Cf. Luxton v. North River Bridge Co.,* 153 U.S. 525, 534, 14 S.Ct. 891, 894, 38 L.Ed. 808 (1894); *Boom Co. v. Patterson,* 98 U.S. 403, 406, 25 L.Ed. 206 (1878) (utility company may exercise delegated eminent domain power over private property for public use).

**14.** *See, e.g., Sweet v. Rechel,* 159 U.S. 380, 16 S.Ct. 43, 43 L.Ed. 188 (1895):

[T]he restriction imposed by the constitution [is] to the effect that statutes passed in the exercise of the police power of the Commonwealth must not be repugnant or contrary to the constitution, one of the provisions of which is, that the owner of private property *appropriated to public uses,* shall receive a reasonable compensation therefor. . . .

Undoubtedly, the State, without taking the title to itself, may, in some appropriate mode and without compensation to the owner, forbid the use of specified private property,

Justice Marshall approved the state government's "broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails." 458 U.S. at 440, 102 S.Ct. at 3179. The Court's citations in support of this longstanding proposition include *Edgar A. Levy Leasing Co. v. Siegel,* 258 U.S. 242, 42 S.Ct. 289, 66 L.Ed. 595 (1922), and *Block v. Hirsh,* 256 U.S. 135, 41 S.Ct. 458, 65 L.Ed. 865 (1921). *Levy* upheld a New York statute similar to the Anti-Eviction Act and the Tenancy Act, placing limits on the landlord's right of action to recover possession from holdover tenants. In *Block,* the Court upheld a District of Columbia ordinance that gave tenants a right of continued occupation following the expiration of their leases. The Court clearly assumed that the creation of the statutory tenancy for private parties was not a taking for public use.[15] Statutory tenancy laws protecting holdover tenants are not takings, but merely regulations of the use

to which private property may be put. Such regulations of the use of private property frequently involve costs to the owner. They are nevertheless not deemed to be takings. *E.g., Goldblatt v. Town of Hempstead,* 369 U.S. 590, 592–94, 82 S.Ct. 987, 989–90, 8 L.Ed.2d 130 (1962); *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 386–97, 47 S.Ct. 114, 117–21, 71 L.Ed. 303 (1926) (industrial zoning); *see* note 16 *infra. See also* Sax, *Takings and the Police Power,* 74 Yale L.J. 36, 61–76 (1964) (terming the distinction one between government as "enterpriser" and government as "mediator").

Where, as here, legislation does not put property to a "public use," it is a constitutional exercise of the state's police power provided, of course, that it satisfies the demands of due process and equal protection. Because the Tenancy Act did not put the plaintiffs' property to public use, but rather regulated its use, the Act is not a taking under the fifth and fourteenth amendments.[16]

where such use would be injurious to the public health. . . .

The difference [is] between an act passed with exclusive reference to the police power of the State, without any purpose to take and apply property to public uses, and a statute like the one here involved, which, for the general good, ordains and establishes regulations declaring the existence of a nuisance

. . . .

159 U.S. at 398–99, 16 S.Ct. at 48 (emphasis in original).

**15.** *Loretto* does inform us, however, that even for *public use* a taking within the meaning of the constitution is likely to be found only when the invasion is permanent in character rather than temporary or intermittent. In so holding, the court distinguished cases such as *Transportation Co. v. Chicago,* 99 U.S. 635, 642, 25 L.Ed. 336 (1879) (temporary flooding caused by construction), and cited with approval Professor Michelman's observation that:

[t]he one incontestable case for compensation (short of formal expropriation) seems to occur when the government deliberately brings it about that its agents, or the public at large, "regularly" use, or "permanently" occupy, space or a thing which theretofore was understood to be under private ownership.

458 U.S. at 427 & n. 5, 102 S.Ct. at 3172 & n. 5, quoting Michelman, *Property, Utility, and Fair-*

*ness: Comments on the Ethical Foundations of "Just Compensation" Law,* 80 Harv.L.Rev. 1165, 1184 (1967).

**16.** It is understandable that the "public use" aspect of the taking clause analysis should become closely identified with the question of the permanent physical nature of the intrusion. Few exercises of the police power require permanent physical intrusion onto private property. In contrast, many public uses—for example, roads, dams, power and communication grids—necessarily involve physical seizure or intrusion. Consequently, most Supreme Court decisions holding governmental action violative of the taking clause have involved both physical intrusion and classic public use. *See, e.g., Portsmouth Harbor Land & Hotel Co. v. United States,* 260 U.S. 327, 329–30, 43 S.Ct. 135, 136–37, 67 L.Ed. 287 (1922) (military use); *Western Union Telegraph Co. v. Pennsylvania R.R.,* 195 U.S. 540, 567–71, 25 S.Ct. 133, 140–41, 49 L.Ed. 312 (1904) (telegraph lines); *Loretto,* 458 U.S. at 429–30, 102 S.Ct. at 3172–73. *But see Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 414–16, 43 S.Ct. 158, 159–60, 67 L.Ed. 322 (1922). Most decisions sustaining governmental action, on the other hand, have involved a common exercise of regulatory power. *See Goldblatt v. Town of Hempstead,* 369 U.S. 590, 592–94, 82 S.Ct. 987, 989–90, 8 L.Ed.2d 130 (1962) (safety ordinance banning excavation); *United States v. Central Eureka Mining Co.,* 357 U.S. 155, 165–66, 78 S.Ct. 1097, 1103, 2 L.Ed.2d 1228

Finally, any doubt that *Loretto* made no change in the law with respect to holdover tenancies is confirmed by the Supreme Court's summary dismissal for want of a substantial federal question in *Fresh Pond Shopping Center, Inc. v. Acheson Callahan,* —— U.S. ——, 104 S.Ct. 218, 78 L.Ed.2d 215 (1983). *Fresh Pond,* an appeal from the decision of the Supreme Court of Massachusetts, rejected a challenge on taking grounds to the provisions of an ordinance of the City of Cambridge. That ordinance requires permission from the Cambridge Rent Control Board to remove occupied rental property from the housing market and to remove a tenant for that purpose. Fresh Pond had alleged that the ordinance authorized a tenant of the shopping center to remain "indefinitely." *A fortiori,* Fresh Pond's case seems stronger than that presented here. In dissenting from the Court's summary affirmance, Justice Rehnquist relied on *Loretto v. Teleprompter Manhattan C.A.T.V. Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982), as analogous. The remaining Justices evidently did not agree.

Instructed by *Mandell v. Bradley,* 432 U.S. 173, 176–77, 97 S.Ct. 2238, 2240–41, 53 L.Ed.2d 199 (1977) (per curiam), we have examined the jurisdictional statement filed in *Fresh Pond Shopping Center, Inc.,* from which it appears that virtually the same taking issue was presented to the Court as is presented here. That question is whether the creation by state law of statutory tenancies after expiration of the tenants' leases amounts to a taking for which the state must provide compensation. The summary disposition of the appeal in *Fresh Pond Shopping Center, Inc.* binds this court. *See Hicks v. Miranda,* 422 U.S. 332, 343–45, 95 S.Ct. 2281, 2288–90, 45 L.Ed.2d 223 (1975). We hold, therefore, that the Tenancy Act

(1958) (prohibition of mining operations during war emergency regulation not a taking); *Miller v. Schoene,* 276 U.S. 272, 279–80, 48 S.Ct. 246, 247–48, 72 L.Ed. 568 (1928) (ordinance requiring destruction of diseased trees); *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 386–97, 47 S.Ct. 114, 117–21, 71 L.Ed. 303 (1926) (industrial zoning); *Hadacheck v. Se-*

constitutes neither a "permanent physical occupation" nor a "public use."

## V.

Section 14 of the Tenancy Act is not facially unconstitutional, either under article I, section 10 as an impairment of the obligation of contract, or under the fourteenth amendment as a taking of property for a public use without just compensation. The judgment appealed from will be reversed.

*bastian,* 239 U.S. 394, 410–13, 36 S.Ct. 143, 145–46, 60 L.Ed. 348 (1915) (prohibition on operation of brickyard); *Mugler v. Kansas,* 123 U.S. 623, 668–69, 8 S.Ct. 273, 300–01, 31 L.Ed. 205 (1887) (prohibition on sale of liquor). *See generally* Note, *Public Use, Private Use, and Judicial Review in Eminent Domain,* 58 N.Y.U. L.Rev. 409 (1983).