The CHICAGO BOARD OF REALTORS, INC., et al., Plaintiffs-Appellants,

v.

The CITY OF CHICAGO, a municipal corporation of the State of Illinois, and the Mayor of the City of Chicago, Defendants-Appellees.

No. 86–2827.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 26, 1987.

Decided May 14, 1987.

Kenneth E. North, Burke, Bosselman & Weaver, Chicago, Ill., for plaintiffs-appellants.

Jennifer A. Keller, Corp. Counsel, Chicago, Ill., for defendants-appellees.

William P. Wilen, Robert E. Lehrer, Timothy Huizenga, Andrew Cohen, Denise Poloyac, Legal Assistance Foundation, Chicago, Ill., for intervenor-defendants-appellees.

Before CUDAHY, POSNER and EASTERBROOK, Circuit Judges.

CUDAHY, Circuit Judge.

On September 8, 1986, the Chicago City Council enacted the Chicago Residential Landlord and Tenant Ordinance (the "Ordinance"), Municipal Code of Chicago, ch. 193.1 (repealing § 193.11), recasting the relative rights and obligations of most residential landlords and tenants in Chicago. On October 14, 1986, the day before the Ordinance was to become effective, this lawsuit began. Plaintiffs-appellants are Chicago property owners or managers and organizations representing their interests. Defendants-appellees are the City of Chicago and its Mayor. Also before the court are three individual tenants and nine organizations representing Chicago tenants.[1] Plaintiffs challenged the constitutionality of the Ordinance and sought a temporary restraining order and a preliminary injunction to prevent its enforcement. A TRO was issued on October 14. On November 3, 1986, the district court denied the preliminary injunction and dissolved the TRO, pending plaintiffs' immediate interlocutory appeal. We granted an expedited appeal schedule but denied plaintiffs' emergency motion for a stay and an injunction pending appeal. We now affirm the district court's denial of plaintiffs' motion for a preliminary injunction.

## I. The Ordinance

The Ordinance, by its own terms, was passed by the Chicago City Council:

in order to protect and promote the public health, safety and welfare of its citizens, to establish the rights and obligations of the landlord and the tenant in the rental of dwelling units, and to encourage the landlord and the tenant to maintain and improve the quality of housing.

Ordinance, § 193.1–1. By its terms the Ordinance applies to all rental agreements for dwelling units located in Chicago, with exceptions for owner-occupied buildings of six or fewer units; dwelling units in hotels, motels, boarding houses and the like; accommodations in hospitals, not-for-profit shelters and school dormitories; and units in cooperatives occupied by holders of proprietary leases. *Id.* § 193.1–2. The Ordinance governs leases either entered into or to be performed after October 15, 1986.

Landlords are required to maintain dwelling units in compliance with all applicable municipal code provisions and with certain other specified standards. *Id.* § 193.1–7, –11. Landlords have the authority, after notice to the tenant, to terminate a lease if the tenant fails to pay rent or otherwise comply with lease requirements. If the landlord accepts the full rent due under a lease knowing that payments are in default, the landlord thereby waives the right to terminate the lease for that default. *Id.* § 193.1–13. Except in case of emergency, the landlord must provide notice two days before entering a unit for maintenance, repairs or inspections. *Id.* § 193.1–5.

After notice to the landlord, tenants are granted authority to withhold rent in an amount reflecting the reasonable value of any material noncompliance with the lease by the landlord. Alternatively, tenants can, again after notice, opt to repair certain minor defects or deficiencies and deduct their reasonable cost from the rent. *Id.* § 103.1–11. Tenants are required to keep their units clean and safe, to use appliances and utilities in a reasonable manner and to avoid disturbing neighbors' "peaceful enjoyment of the premises." *Id.* § 193.1–4.

The Ordinance prohibits a charge greater than ten dollars per month for late payment of rent. *Id.* § 193.1–14(h). In addition, all security deposits received after January 1, 1987 must be maintained in a federally insured account in a financial institution located in Illinois.

---

1. The district court expressly held that the tenants and tenant organizations did not have a right to intervene in this case under Federal Rule of Civil Procedure 24(a), but the court did not specify whether their appearance was pursuant to Rule 24(b) (permissive intervention) or as amicus curiae. The district court was convinced that their appearance would be of assistance. Like the district court, we do not decide the difficult question whether these individuals and organizations would be proper parties in this action. A resolution of that question is unnecessary for the disposition of this appeal.

## II. Preliminary Injunction Standards

■ In their ten-count complaint the plaintiffs allege that the Ordinance is unconstitutional; they seek a preliminary injunction against its enforcement. In the district court, Judge Parsons denied the motion for a preliminary injunction, concluding that the plaintiffs did not have a reasonable likelihood of prevailing on the merits of their complaint. In reviewing the denial of a preliminary injunction the question before us is whether the district court abused its discretion. *See Lawson Prods., Inc. v. Avnet, Inc.,* 782 F.2d 1429, 1436–39 (7th Cir.1986). A claim that a statute is unconstitutional on its face, of course, presents many issues that become pure questions of law. We independently review these questions of law in determining whether or not the district court abused its discretion in denying the preliminary injunction.

A plaintiff seeking a preliminary injunction must demonstrate: (1) a threat of irreparable harm without an adequate remedy at law; (2) some likelihood of success on the merits of the claim; (3) a balance of relative harm weighing in favor of granting the injunction; and (4) compatability of the injunction and the public interest. *See A.J. Canfield Co. v. Vess Beverages, Inc.,* 796 F.2d 903, 906 (7th Cir.1986) (citing *Roland Mach. Corp. v. Dresser Indus.,* 749 F.2d 380, 386–88 (7th Cir.1984)). This circuit has determined that a plaintiff must demonstrate at least "some probability" of success on the merits before a preliminary injunction can issue, *see Brunswick Corp. v. Jones,* 784 F.2d 271, 275 (7th Cir.1986); *accord Centurion Reinsurance Co. v. Singer,* 810 F.2d 140, 145 (7th Cir.1987) (if there is "only a very slight chance of prevailing," no injunction should issue); *A.J. Canfield Co. v. Vess Beverages, Inc.,* 796 F.2d at 906 (if chance of prevailing is "less than negligible," no injunction should issue); *Omega Satellite Prods. Co. v. City of Indianapolis,* 694 F.2d 119, 123 (7th Cir.1982) (if chance of prevailing is "better than negligible," then an injunction could issue). Reducing the standard of success-on-the-merits to a precise verbal formulation is difficult, a state of affairs which

seems to emphasize the equitable nature of the entire preliminary injunction inquiry. *See Lawson Prods. v. Avnet,* 782 F.2d at 1441 (affirming the "traditional equitable factors governing injunctions"). Judge Parsons, after expedited hearings in the district court and a detailed consideration of the plaintiffs' several claims, concluded that the plaintiffs had not shown the requisite reasonable likelihood of prevailing on the merits. As indicated below, we agree.

## III. Likelihood of Prevailing on the Merits

In the district court the plaintiffs argued that the Ordinance on its face violated the following constitutional doctrines or provisions: the contract clause, procedural due process, the void-for-vagueness doctrine, substantive due process, equal protection, the takings clause and the commerce clause. The plaintiffs also argued that the Ordinance was preempted by the Illinois Real Estate License Act of 1983, Ill.Rev. Stat. ch. 111, ¶¶ 5801 *et seq.* (1985), and that enforcement of the Ordinance was or would be violative of the plaintiffs' civil rights protected under 42 U.S.C. § 1983 (1982). The district court concluded that the plaintiffs had not shown a reasonable likelihood of prevailing on any of these claims. The plaintiffs on appeal do not contest this ruling with respect to the takings clause and the commerce clause. We consider the remaining issues in turn.

### A. The Contract Clause

■ The Constitution prohibits a state from passing "any ... law impairing the Obligation of Contract," U.S. Const. art. I, § 10, cl. 1. The plaintiffs contend that the Ordinance violates this provision by destroying pre-existing contractual rights and bargained-for expectations contained in leases entered into before October 15, 1986. Despite the mandatory language of the contract clause, however, the Supreme Court has repeatedly affirmed that the clause does not abrogate a state's inherent power to protect the interests of its citizens. *See Keystone Bituminous Coal Ass'n v. DeBenedictis,* — U.S. —, 107

S.Ct. 1232, 1251–53, 94 L.Ed.2d 472 (1987); *Energy Reserves Group v. Kansas Power & Light Co.*, 459 U.S. 400, 410, 103 S.Ct. 697, 703, 74 L.Ed.2d 569 (1983); *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 241, 98 S.Ct. 2716, 2720, 57 L.Ed.2d 727 (1978); *United States Trust Co. v. New Jersey*, 431 U.S. 1, 16, 97 S.Ct. 1505, 1514, 52 L.Ed.2d 92 (1977); *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 434, 54 S.Ct. 231, 238, 78 L.Ed. 413 (1934); *Manigault v. Springs*, 199 U.S. 473, 480, 26 S.Ct. 127, 130, 50 L.Ed. 274 (1905). The Court has outlined a three-step inquiry to determine whether or not a law violates the contract clause. First, we must ask whether the Ordinance in fact operates as a substantial impairment of existing contractual relationships; second, we must inquire whether the city has a significant and legitimate public purpose justifying the Ordinance; and third, we must ask whether the effect of the Ordinance on contracts is reasonable and appropriate given the public purpose behind the Ordinance. *See Energy Reserves Group*, 459 U.S. at 411–12, 103 S.Ct. at 704–05.

The aspects of the Ordinance that most affect existing contracts are, according to the plaintiffs, provisions that prohibit late payment charges larger than ten dollars per month, that require that security deposits be held in interest-bearing accounts, that require acceptance of subleases and that shift duties of repair from tenant to landlord. *See* Appellants' Brief at 37. The plaintiffs build their argument on *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 98 S.Ct. 2716, which struck down as contrary to the contract clause a Minnesota statute imposing specific pension obligations on employers who either terminated an existing pension plan or closed an office in Minnesota. In *Spannaus* the Court found the Minnesota law unconstitutional by concluding that the law had a "severe" effect on contractual obligations, *id.* at 246, 98 S.Ct. at 2723, that the law was enacted to protect a narrow class rather than a broad societal interest, *id.* at 248–29, 98 S.Ct. at 2724–25, and that the law imposed a "sudden, totally unanticipated" change in contractual obligations,

*id.* at 249, 98 S.Ct. at 2725. The plaintiffs urge that the Ordinance similarly operates as a severe, sudden and narrowly targeted alteration of contractual obligations.

We are not certain that the Ordinance causes only insubstantial changes in contractual relationships. The $10 cap on late payment fees alone may cost plaintiffs some $4 million in revenues. *See* Appellants' Brief at 46. Interest on security deposits is required from some landlords who previously were exempt. *See* Ill.Rev. Stat. ch. 80, ¶ 121 (1985) (requiring 5% annual interest only from landlords of property with 25 or more units). These cost burdens are difficult to characterize as insubstantial. But, in any event, the Supreme Court has suggested that a sort of sliding scale is appropriate. That is, the level of scrutiny given the law varies directly in accordance with the severity of the impairment of existing contracts, *see Energy Reserves Group*, 459 U.S. 411, 103 S.Ct. at 704; *Spannaus*, 438 U.S. at 245, 98 S.Ct. at 2723, and varies inversely in accordance with the degree of prior regulation in a particular field of activity, *see Energy Reserves Group*, 459 U.S. at 411, 103 S.Ct. at 704; *Spannaus*, 438 U.S. at 242 n. 13, 98 S.Ct. at 2721 n. 13; *Veix v. Sixth Ward Bldg. & Loan Ass'n*, 310 U.S. 32, 38, 60 S.Ct. 792, 794, 84 L.Ed. 1061 (1940) ("When he purchased into an enterprise already regulated in the particular to which he now objects, he purchased subject to further legislation upon the same topic.").

We are certain that the landlord-tenant relationship is, if nothing else, heavily regulated. The plaintiffs suggest that the only Illinois regulation "affecting the landlord-tenant relationship" is the Forcible Entry and Detainer Act, governing recovery of rent or possession. Ill.Rev.Stat. ch. 110, ¶ 9–201 *et seq.* (1985). This suggestion is insupportable. Scores of state laws and common law tenets define relative rights and obligations of landlord and tenants. *See, e.g., Jack Spring, Inc. v. Little*, 50 Ill.2d 351, 280 N.E.2d 208 (1972); *South Austin Realty Ass'n v. Sombright*, 47 Ill. App.3d 89, 5 Ill.Dec. 472, 361 N.E.2d 795

(1st Dist.1977); Ill.Rev.Stat. ch. 24, ¶¶ 11–13–15; ch. 30, ¶¶ 301 *et seq.*; ch. 68, ¶¶ 1–101 *et seq*; ch. 80, ¶¶ 62–63, ¶ 71; ¶¶ 121–123; ch. 110, ¶¶ 9–101 *et seq.;* ch. 110, ¶¶ 2–1301(c), ¶ 9–108; *cf.* Intervenor-Defendants' Brief at 12 n. *, 31–32. The state has previously defined obligations in the same areas as those in which the plaintiffs have entered challenges. *See, e.g.,* Ill.Rev.Stat. ch. 80, ¶ 121 (requiring interest on certain security deposits); *Jack Spring,* 50 Ill.2d 351, 280 N.E.2d 208 (creating right to withhold rent for landlord's failure to maintain premises). The extent of this prior regulation suggests that the Ordinance in fact might not substantially impair any contract obligations. *Cf. Troy Ltd. v. Renna,* 727 F.2d 287, 297 (3d Cir.1984) (suggesting no impairment of contract in tenancy law that merely "enlarged ... a preexisting statutory" right to continued tenancy); *Rue-Ell Enters. v. City of Berkeley,* 147 Cal.App.3d 81, 194 Cal.Rptr. 919 (1st Dist.1981). At the least, prior regulation dictates a lowered level of scrutiny.

With a relaxed level of scrutiny, then, we ask whether legitimate and significant purposes support the Ordinance and the contractual impairments that it works. The plaintiffs suggest that the actual purpose behind the Ordinance is simply to "provide[ ] one group with an economic advantage over another group," Appellants' Reply Brief at 17, rather than to protect the public health or welfare. Of course, regulatory legislation may frequently tip the economic scales but at the same time serve entirely legitimate purposes. The expressed purpose of the Ordinance is to promote public health and welfare by improving the quality of housing in the city. The city apparently concluded that this purpose could be furthered by enacting the Ordinance and redefining some rights and obligations for landlords and tenants. On the record before us, we cannot say that the Ordinance is without a legitimate and significant public purpose.

With respect to the third step of the inquiry, we note at the outset that, when the state or its agent is not a party to the contract impaired by the challenged law, the court's scrutiny is relaxed. *See Keystone Bituminous Coal Ass'n,* 107 S.Ct. at 1253; *Energy Reserves Group,* 459 U.S. at 412 n. 14, 103 S.Ct. at 705 n. 14. The question whether the Ordinance is reasonable and appropriate in light of its intended public purpose brings to mind an earlier era when courts aggressively reviewed the appropriateness of economic regulations under the rubric of substantive due process. *See Lochner v. New York,* 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905). The Supreme Court has recently cautioned that, unless the state itself is a contracting party, "[a]s is customary in reviewing economic and social regulation ... courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." *United States Trust Co. v. New Jersey,* 431 U.S. at 22–23, 97 S.Ct. at 1517–18; *accord Keystone Bituminous Coal Ass'n,* 107 S.Ct. at 1253; *Energy Reserves Group,* 459 U.S. at 412–13, 103 S.Ct. at 705. In any event, and certainly without passing judgment on its advisability, we believe that the Ordinance may represent a rational allocation of rights and responsibilities between landlords and tenants. This is an allocation that the city rationally could have believed would lead to improved public health and welfare.

Accordingly, we agree with the district court that the plaintiffs did not show a reasonable probability of prevailing on their contract clause claim. We have found no case, and none has been cited to us, in which a similar landlord-tenant law has been found unconstitutional under the contract clause. The plaintiffs have failed to present persuasive reasons why the present Ordinance should not similarly pass muster.[2]

---

**2.** In this connection, Judge Cudahy joins the separate opinion only to the extent that it notes "that the plaintiffs in this case have an extremely uphill battle against the ordinance on contract clause grounds ... a battle they cannot possibly win on the basis of the evidence they presented in seeking a preliminary injunction.

An even stronger conclusion is possible with regard to their challenge on the ground of 'substantive due process.'" *See infra* at 744. Judge Cudahy believes that the economic critique of the Ordinance contained in the separate opinion has not been litigated here and is, at best, superfluous.

## B. *Procedural Due Process*

The plaintiffs assert that the Ordinance deprives them of protected property rights without procedural due process as guaranteed by the fourteenth amendment. The essence of this argument seems to be that the Ordinance is unconstitutional because it delegates to tenants—inherently biased decisionmakers—a broad discretion to withhold rent while retaining possession of a landlord's property. *See* Appellants' Brief at 13 ("It is the City's failure to provide such [clear] standards and procedural protections in the Ordinance which deprives Plaintiffs of their right to procedural due process....")

■ The first step in this inquiry, of course, is to determine what, if any, state action exists. We are not convinced that actions taken by tenants, pursuant to the Ordinance, comprise state action. A law that defines rights, obligations or remedies among private parties does not thereby transform every private enforcement of that law into state action. *See Blum v. Yaretsky,* 457 U.S. 991, 1003, 102 S.Ct. 2777, 2785, 73 L.Ed.2d 534 (1982). The Supreme Court considered the issue of what action by a private citizen constitutes state action in *Flagg Brothers, Inc. v. Brooks,* 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978), where the Court held that a warehouseman's forced sale of a debtor's goods, pursuant to New York law, was not state action, because by merely delegating a power to resolve disputes, New York had not delegated any "exclusive public function." *Id.* at 161, 98 S.Ct. at 1739. To the extent that the Ordinance shifts from the landlord to the tenant the power initially to determine whether the premises are in accordance with the lease terms (and with municipal standards embodied in the terms), the Ordinance has readjusted property rights. But this is not a delegation of an exclusive public function; it does not import state action into every action a tenant or landlord might take. We believe that neither a landlord's unlawful lock-out of a tenant nor a tenant's unlawful withholding of rent from a landlord would of itself involve state action. *See Hinman v. Lincoln Towing Serv., Inc.,* 771 F.2d 189, 192–93 (7th Cir.1985) (regulation by state does not render towing company a state actor); *Bernstein v. Lind-Waldock & Co.,* 738 F.2d 179, 186 (7th Cir.1984) (act of commodity exchange is not state action despite heavy regulation of the exchange and its undertaking some policy functions). This analysis does not end the matter, however, because the plaintiffs charge that the Ordinance itself, enacted by the City, works a deprivation of protected property rights.

■ The enactment of the Ordinance itself undoubtedly represents state action. The Ordinance, however, does not deprive the plaintiffs of rights in property without due process. The plaintiffs' strongest argument is that the Ordinance provides inadequate post-deprivation remedies by which a landlord can challenge rent withholdings and regain possession. But the Ordinance does not significantly alter the preexisting post-deprivation remedy, the Illinois Forcible Entry and Detainer Act, Ill. Rev.Stat. ch. 110, ¶ 9–101 *et seq.* Plaintiffs have not shown that the Forcible Entry and Detainer Act is an unconstitutionally slow or onerous procedure. *Cf. Pleasure Driveway & Park Dist. v. Kurek,* 27 Ill.App.3d 60, 325 N.E.2d 650 (3d Dist.1975) (Forcible Entry and Detainer Act comports with procedural due process). If the Ordinance had established a new post-deprivation procedure by which, for instance, a landlord could not recover possession for five years after a rent default, the plaintiffs would have a much stronger case.

■ The Ordinance prohibits a late payment penalty exceeding $10 per month. This undoubtedly will cost some landlords some money. But a law that imposes heavier economic burdens on some group of citizens is not thereby rendered unconstitutional. The procedure the landlords were due in this respect was accorded them—in the legislature. *See Minnesota State Bd. for Community Colleges v. Knight,* 465 U.S. 271, 104 S.Ct. 1058, 79

L.Ed.2d 299 (1984); *Bi-Metallic Investment Co. v. State Bd. of Equalization*, 239 U.S. 441, 36 S.Ct. 141, 60 L.Ed. 372 (1915).

■ In addition, the Ordinance requires that landlords attach a copy of the Ordinance to each lease. It is inconceivable that this violates procedural due process.

■ We conclude that the Ordinance simply readjusts the balance in the long-standing landlord-tenant relationship. Nothing suggests that the Ordinance itself works a deprivation of property without procedural due process. Rather, the Ordinance appears merely to shift some bargaining power to the tenant. This in itself does not violate procedural due process. *Cf. Fisher v. City of Berkeley*, 37 Cal.3d 644, 693 P.2d 261, 209 Cal.Rptr. 682 (1984) (en banc) (upholding rent withholding procedures).

### C. Void-for-Vagueness

■ The Ordinance establishes certain standards with which the leasing of residential property must comply. The plaintiffs argue that the standards provided are so vague as to violate due process. We disagree. When challenged on vagueness grounds, economic regulatory laws are subject to less stringent standards than are laws applicable, for example, to speech. Laws imposing only civil penalties and not threatening, for instance, rights of expression are not scrutinized with unusual vigor. *See Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99, 102 S.Ct. 1186, 1193–94, 71 L.Ed.2d 362 (1982). A facial challenge to the vagueness of a law that does not restrict constitutionally protected conduct can prevail "only if the enactment is impermissibly vague in all of its applications." *Id.* at 495, 102 S.Ct. at 1191.

■ In defining what constitutes a landlord's "material noncompliance" with a lease, the Ordinance incorporates municipal laws and regulations and provides twenty-seven examples of what the term means. Ordinance, ch. 193.1–11. This is clear and detailed treatment; the provisions are not vague. In addition, the Ordinance prohib-its an otherwise lawful entry into leased premises if the entry is accomplished in an "unreasonable manner," *id.* ch. 193.1–6, and the Ordinance establishes an evidentiary presumption of retaliatory eviction in certain circumstances. Neither of these provisions fails to provide adequate warning of what violates the Ordinance, and both provisions sufficiently guide enforcement. The Ordinance is not unconstitutionally vague. It describes with adequate specificity the mutual rights and obligations of landlord and tenant.

### D. Substantive Due Process

The heart of the plaintiffs' attack on the Ordinance, if gauged by rhetorical passion, seems to involve substantive due process: "[S]tripped of the platitudes, the Ordinance ... places the unprotected liberties of tenants above the protected property rights of landlords.... [The] Ordinance goes too far." Appellants' Reply Brief at 9–10. Likening the Ordinance to the felling of a forest of property rights, the plaintiffs warn: "As courts allow more trees to be felled for the sake of labels, who can predict which will be the last tree, leaving but a forest of stumps and decaying logs ... forever changing the fabric of our country." *Id.* at 10.

■ Passionate concern is not, however, enough to demonstrate a violation of substantive due process. Legislative acts "adjusting the burdens and benefits of economic life" are presumed constitutional, and "the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976); *see National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry.*, 470 U.S. 451, 476–77, 105 S.Ct. 1441, 1457–58, 84 L.Ed.2d 432 (1985); *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 82–84, 98 S.Ct. 2620, 2635–36, 57 L.Ed.2d 595 (1978); *Miller v. City of Chicago*, 774 F.2d 188, 195–96 (7th Cir.1985). We are quite sure that the city has the authority to legislate in order to regulate the landlord-

tenant relationship and promote better housing. *See* Ill. Const. art. VII, § 6(a); *City of Evanston v. Create, Inc.,* 85 Ill.2d 101, 113, 51 Ill.Dec. 688, 421 N.E.2d 196 (1981). In its detailed assignment of relative rights and obligations, we believe, without appraising its wisdom, that the Ordinance is rationally related to, and directly purports to further, these legitimate purposes. We cannot say that substantive due process is violated.

### E. Equal Protection

■ The Ordinance exempts several categories of dwellings from its coverage, such as owner-occupied buildings containing six or fewer dwelling units. Ordinance, ch. 193.1–2(a). The plaintiffs argue that this provision of the Ordinance violates the equal protection clause of the fourteenth amendment. We do not agree.

No one suggests that a suspect class is created (or a fundamental right affected) by the Ordinance, and no one disputes that a legitimate purpose underlies the Ordinance. Hence the legislation is presumed to be consistent with equal protection. *City of New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976). The plaintiffs urge that the classification is so arbitrary and irrational as to violate equal protection. Doubtless, the classification carries considerable consequences—a landlord not subject to the Ordinance faces a significantly different regulatory framework from one who is covered. But plaintiffs must show that no set of facts reasonably could be conceived to establish a rational basis for the classification. *United States R.R. Retirement Bd. v. Fritz,* 449 U.S. 166, 179, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1980). Defendants suggest several plausible reasons supporting the arrangement: owners living in the building may be more responsive to tenants, more attentive to building conditions and may provide services more quickly. Perhaps the burden imposed by the Ordinance would be too onerous on smaller units. Or perhaps housing deterioration is more acute in larger apartment buildings. These plausible reasons are sufficient. *See id.* We note also that classifications such

as the one before us are quite common in laws relating to housing. *See, e.g.,* Civil Rights Act of 1964, 42 U.S.C. § 2000a(b)(1) (1982) (exempting owner-occupied establishments of five or fewer rooms); Ill.Rev.Stat. ch. 80, ¶ 101 (exempting buildings of ten or fewer units); ch. 80, ¶ 121 (exempting buildings of twenty-five or fewer units).

### F. Preemption by State Law

■ In somewhat the same way as a federal law could preempt an Illinois law, an Illinois law could preempt an ordinance enacted by a "home rule unit," such as Chicago. *See* Ill. Const. art. VII, § 6; *United Private Detective and Security Ass'n v. City of Chicago,* 62 Ill.2d 506, 343 N.E.2d 453, (1976). But Illinois courts have consistently held that preemption occurs only if a state law expressly indicates an intent to preempt home rule authority. *See People ex rel. Bernardi v. City of Highland Park,* No. 62,419, slip op. at 7 (Ill. S.Ct. Nov. 20, 1986); *City of Evanston v. Create, Inc.,* 85 Ill.2d at 107, 51 Ill.Dec. at 691, 421 N.E.2d at 199; *Stryker v. Village of Oak Park,* 62 Ill.2d 523, 528, 343 N.E.2d 919, 923, *cert. denied,* 429 U.S. 832, 97 S.Ct. 95, 50 L.Ed.2d 97 (1976). The Illinois Supreme Court has specifically found that the state landlord-tenant statute does not preempt home rule unit legislation governing landlord-tenant relationships. *Create, Inc.,* 85 Ill.2d at 108–14, 51 Ill.Dec. at 691–694, 421 N.E.2d at 199–202 (construing Ill.Rev.Stat. ch. 80, ¶¶ 1 *et seq.* (1985)). The plaintiffs now argue that the state law regulating the *licensing* of real estate brokers and salespersons, Illinois Real Estate Licensing Act of 1983, Ill.Rev.Stat. ch. 111, ¶¶ 5801 *et seq.* (1985), preempts the entire field of landlord-tenant law. We agree with the district court that the Real Estate Licensing Act is concerned solely with licensing and does not purport to preempt home rule units from legislating in the general area of landlord-tenant law.

### IV. Conclusion

After reviewing the merits of the plaintiffs' several constitutional challenges to

the Ordinance, we agree with the district court that, on the record before us, the plaintiffs have not shown any reasonable likelihood of prevailing on any claim. It is therefore unnecessary to consider the remaining three factors governing when a preliminary injunction will issue—irreparable harm, a balancing of potential harms and a consideration of the public interest. We note only that the plaintiffs, in describing their "irreparable harm," focus on lost rental income and additional administrative expenses. We doubt whether such calculable injuries would outweigh the expressed interest of the city in improving living conditions of tenants.

The judgment of the district court is AFFIRMED.

POSNER, Circuit Judge, with whom EASTERBROOK, Circuit Judge, joins.

We agree with Judge Cudahy's opinion as far as it goes, and we therefore join it. But in our view it does not go far enough. It makes the rejection of the appeal seem easier than it is, by refusing to acknowledge the strong case that can be made for the unreasonableness of the ordinance. It does not explain how the district judge's denial of a preliminary injunction against such an interference with contract rights and economic freedom can be affirmed without violating the contract clause and the due process clause of the Constitution. So we are led to write separately, and since this separate opinion commands the support of two members of this panel, it is also a majority opinion.

The new ordinance rewrites present and future leases of apartments in Chicago to give tenants more legal rights than they would have without the ordinance. It requires the payment of interest on security deposits; requires that those deposits be held in Illinois banks; allows (with some limitations) a tenant to withhold rent in an amount reflecting the cost to him of the landlord's violating a term in the lease; allows a tenant to make minor repairs and subtract the reasonable cost of the repair from his rent; forbids a landlord to charge a tenant more than $10 a month for late payment of rent (regardless of how much is owing); and creates a presumption (albeit rebuttable) that a landlord who seeks to evict a tenant after the tenant has exercised rights conferred by the ordinance is retaliating against the tenant for the exercise of those rights.

The stated purpose of the ordinance is to promote public health, safety, and welfare and the quality of housing in Chicago. It is unlikely that this is the real purpose, and it is not the likely effect. Forbidding landlords to charge interest at market rates on late payment of rent could hardly be thought calculated to improve the health, safety, and welfare of Chicagoans or to improve the quality of the housing stock. But it may have the opposite effect. The initial consequence of the rule will be to reduce the resources that landlords devote to improving the quality of housing, by making the provision of rental housing more costly. Landlords will try to offset the higher cost (in time value of money, less predictable cash flow, and, probably, higher rate of default) by raising rents. To the extent they succeed, tenants will be worse off, or at least no better off. Landlords will also screen applicants more carefully, because the cost of renting to a deadbeat will now be higher; so marginal tenants will find it harder to persuade landlords to rent to them. Those who do find apartments but then are slow to pay will be subsidized by responsible tenants (some of them marginal too), who will be paying higher rents, assuming the landlord cannot determine in advance who is likely to pay rent on time. Insofar as these efforts to offset the ordinance fail, the cost of rental housing will be higher to landlords and therefore less will be supplied—more of the existing stock than would otherwise be the case will be converted to condominia and cooperatives and less rental housing will be built.

The provisions of the ordinance requiring that interest on security deposits be paid and that those deposits be kept in Illinois banks are as remote as the provision on late payment from any concern with the health or safety of Chicagoans, the quality

of housing in Chicago, or the welfare of Chicago as a whole. Their only apparent rationale is to transfer wealth from landlords and out-of-state banks to tenants and local banks—making this an unedifying example of class legislation and economic protectionism rolled into one. However, to the extent the ordinance seeks to transfer wealth from landlords to tenants it could readily be undone by a rent increase; the ordinance puts no cap on rents. Cf. Coase, *The Problem of Social Cost*, 3 J. Law & Econ. 1 (1960).

The provisions that authorize rent withholding, whether directly or by subtracting repair costs, may seem more closely related to the stated objectives of the ordinance; but the relation is tenuous. The right to withhold rent is not limited to cases of hazardous or unhealthy conditions. And any benefits in safer or healthier housing from exercise of the right are likely to be offset by the higher costs to landlords, resulting in higher rents and less rental housing.

The ordinance is not in the interest of poor people. As is frequently the case with legislation ostensibly designed to promote the welfare of the poor, the principal beneficiaries will be middle-class people. They will be people who buy rather than rent housing (the conversion of rental to owner housing will reduce the price of the latter by increasing its supply); people willing to pay a higher rental for better-quality housing; and (a largely overlapping group) more affluent tenants, who will become more attractive to landlords because such tenants are less likely to be late with the rent or to abuse the right of withholding rent—a right that is more attractive, the poorer the tenant. The losers from the ordinance will be some landlords, some out-of-state banks, the poorest class of tenants, and future tenants. The landlords are few in number (once owner-occupied rental housing is excluded—and the ordinance excludes it). Out-of-staters can't vote in Chicago elections. Poor people in our society don't vote as often as the affluent. See Filer, An Economic Theory of Voter Turnout 81 (Ph.D. thesis, Dept. of Econ., Univ. of Chi., Dec. 1977); Statistical Abstract of the U.S., 1982–83, at pp. 492–93 (tabs. 805, 806). And future tenants are a diffuse and largely unknown class. In contrast, the beneficiaries of the ordinance are the most influential group in the city's population. So the politics of the ordinance are plain enough, cf. DeCanio, *Rent Control Voting Patterns, Popular Views, and Group Interests*, in Resolving the Housing Crisis 301, 311–12 (Johnson ed. 1982), and they have nothing to do with either improving the allocation of resources to housing or bringing about a more equal distribution of income and wealth.

A growing body of empirical literature deals with the effects of governmental regulation of the market for rental housing. The regulations that have been studied, such as rent control in New York City and Los Angeles, are not identical to the new Chicago ordinance, though some—regulations which require that rental housing be "habitable"—are close. The significance of this literature is not in proving that the Chicago ordinance is unsound, but in showing that the market for rental housing behaves as economic theory predicts: if price is artificially depressed, or the costs of landlords artificially increased, supply falls and many tenants, usually the poorer and the newer tenants, are hurt. See, e.g., Olsen, *An Econometric Analysis of Rent Control*, 80 J.Pol.Econ. 1081 (1972); Rydell et al., The Impact of Rent Control on the Los Angeles Housing Market, ch. 6 (Rand Corp. N–1747–LA, Aug. 1981); Hirsch, *Habitability Laws and the Welfare of Indigent Tenants*, 61 Rev.Econ. & Stat. 263 (1981). The single proposition in economics from which there is the least dissent among American economists is that "a ceiling on rents reduces the quantity and quality of housing available." Frey et al., *Consensus and Dissension Among Economists: An Empirical Inquiry*, 74 Am. Econ.Rev. 986, 991 (1984) (tab. 2).

Article I, § 10, cl. 1 of the Constitution—the "contract clause"—forbids a state to pass "any ... Law impairing the Obligation of Contracts." If the contract clause were taken seriously, the Chicago ordinance, to the extent it modifies existing

leases as well as prescribing terms for future ones, would certainly violate the clause. And even though the clause isn't taken very seriously nowadays by those whose views matter the most (Justices of the Supreme Court), the plaintiffs may conceivably be able to prove a violation when the case is tried on the merits. No one argues that the ordinance is not a "law" for purposes of the contract clause or that a lease is not a contract, and no one could doubt that the ordinance impairs the contractual obligations of the tenants: abrogating an obligation impairs the obligation. One might suppose, by analogy to the just-compensation clause, that the hardest cases under the contract clause would be those where the state, without actually abrogating a contract in whole or part, did something that made a person's contractual rights much less valuable. See *Northwestern Fertilizing Co. v. Village of Hyde Park*, 97 U.S. (7 Otto) 659, 24 L.Ed. 1036 (1878); cf. *Agins v. Tiburon*, 447 U.S. 255, 262, 100 S.Ct. 2138, 2142, 65 L.Ed.2d 106 (1980). This is not such a case. The ordinance transfers contractual entitlements from the party on one side of the contract to the party on the other side.

The Supreme Court, however, has rewritten the contract clause, by inserting the word "unreasonably" before "impairing" and by adopting a radically undemanding definition of "reasonableness." The first step is neither an uncommon nor an unwarranted interpretive response to a provision absolute in terms. Section 1 of the Sherman Act, 15 U.S.C. § 1, outlaws contracts that restrain trade, but the Supreme Court has sensibly interpreted the statute as if "unreasonably" appeared before "restrain." See, e.g., *National Soc'y of Professional Engineers v. United States*, 435 U.S. 679, 687–88, 98 S.Ct. 1355, 1363–64, 55 L.Ed.2d 637 (1978). A similar job of reparative surgery on the contract clause would raise few eyebrows if, for example, a state passed a statute outlawing contracts—existing as well as new ones—to commit criminal acts or, a slightly more difficult case, a statute criminalizing conduct required by existing contracts. See *Manigault v. Springs*, 199 U.S. 473, 480, 26 S.Ct. 127, 130, 50 L.Ed. 274 (1905) (dictum). These examples can be generalized: the state should be permitted to abrogate contracts if there is a strong need to do so, notwithstanding the apparently absolute character of the contract clause. This principle is illustrated by *Marcus Brown Holding Co. v. Feldman*, 256 U.S. 170, 198–99, 41 S.Ct. 465, 466, 65 L.Ed. 877 (1921) (Holmes, J.). As an emergency measure during New York City's acute World War I housing shortage, the State of New York passed a statute forbidding landlords in the city to evict tenants after the expiration of their lease, unless the tenant wasn't paying his rent or was otherwise objectionable. The Supreme Court held that the statute did not violate the contract clause. See also *Edgar A. Levy Leasing Co. v. Siegel*, 258 U.S. 242, 42 S.Ct. 289, 66 L.Ed. 595 (1922).

Chief Justice Hughes' extensive reexamination of the contract clause in *Home Building & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 438, 54 S.Ct. 231, 240, 78 L.Ed. 413 (1934), led him to suggest a broader principle: legislation impairing the obligation of contracts is constitutional if "the legislation is addressed to a legitimate end and the measures taken are reasonable and appropriate to that end." But he also emphasized the emergency character of the challenged legislation—legislation imposing, in the trough of the Great Depression, a moratorium on the foreclosure of mortgages. See *id.* at 439–40, 444–45, 54 S.Ct. at 240–41, 242–43; cf. *id.* at 441–42, 54 S.Ct. at 241–42. There is no emergency in the present case. Chicago would not collapse if the ordinance weren't allowed to go into effect until existing leases, most of which are for only one year, expired. Chicago would be better off if the ordinance never went into effect.

But if *Blaisdell* might be read narrowly, to require that an impairment of contractual obligation, if it is to survive challenge under the contract clause, be justified by the existence of an emergency, later cases, illustrated by *Veix v. Sixth Ward Bldg. & Loan Ass'n*, 310 U.S. 32, 39–40, 60 S.Ct. 792, 795–96, 84 L.Ed. 1061 (1940), so fictionalized the concept of an "emergency" that

by 1978 the Court found it necessary to remind bench and bar that the contract clause was "not a dead letter." *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 241, 98 S.Ct. 2716, 2720, 57 L.Ed.2d 727 (1978). The test used in *Spannaus,* however, and adhered to since, see, e.g., *Keystone Bituminous Coal Ass'n v. DeBenedictis,* —— U.S. ——, 107 S.Ct. 1232, 1251–53, 94 L.Ed.2d 472 (1987), is a broad, loose, and forgiving standard of reasonableness, see 438 U.S. at 242–51, 98 S.Ct. at 2721–26. It stresses the importance of whether the contracting parties are operating in an already regulated field and can therefore anticipate the possibility of new regulation that will alter the obligations imposed by the contract. See *id.* at 242 n. 13, 250, 98 S.Ct. at 2721 n. 13, 2725; *Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 411, 413–16, 103 S.Ct. 697, 704, 705–07, 74 L.Ed.2d 569 (1983). So the more the state regulates, the more it can regulate without violating the Constitution—a bootstrapping approach if ever there was one. And when the state is not a party to the contract, its judgment regarding both ends and means is to be given great deference. See, e.g., *id.* at 412–13, 103 S.Ct. at 705; *Troy Ltd. v. Renna,* 727 F.2d 287, 294–96 (3d Cir.1984).

By exploiting the unfortunate ambiguities that surround the word "reasonable," the Supreme Court has defanged the contract clause. Admittedly, the seeds of this development were planted by a number of nineteenth-century cases, well discussed in Wright, The Contract Clause of the Constitution, ch. 8 (1938), which held that the state could use its "police power" to override contracts. But the "police power" as then conceived was the power to carry out the essential functions of minimum government; it was not a comprehensive welfare power. Otherwise the decisions that struck down under the due process clause of the Fourteenth Amendment state statutes that infringed freedom of contract would be unintelligible, as would be the decisions that struck down state action challenged under the contract clause itself. See Wright, *supra,* ch. 4. And otherwise the states would have plenary power to impair the obligation of contracts, and the contract clause would mean nothing. It means little more than that today.

Imagine what freedom of speech would have come to mean if the Court had interpreted the First Amendment—which is no more absolute in its language or clearcut in its history than the contract clause—as loosely as it now interprets the contract clause. The different fates of these two similarly worded provisions exemplify the contemporary dualism in constitutional law. (On the larger dualism in social thought which this difference reflects see Director, *The Parity of the Economic Market Place,* 7 J. Law & Econ. 1 (1964).) Constitutional provisions that protect rights which are "preferred," though preferred for reasons that cannot be referred to the text or history of the Constitution, are read broadly; provisions that protect rights which are not preferred are read narrowly. The dissenting Justices in *Spannaus* suggested that virtually no impairment of contractual obligations that satisfies due process will violate the contract clause. See 438 U.S. at 251, 98 S.Ct. at 2725. Whatever its merits as a proposal—as a proposal in effect to delete the contract clause from the Constitution as excess baggage now that "due process" means anything a court wants it to mean—this is a pretty accurate description of what the Supreme Court has been doing in recent years. One is troubled, however, by an approach to constitutional interpretation that by watering down a strongly worded clause of the Constitution (the contract clause) and thickening a watery clause (the due process clause) homogenizes a diverse text.

At all events it is clear that the plaintiffs in this case have an extremely uphill battle against the ordinance on contract clause grounds, cf. *Troy Ltd. v. Renna, supra,* 727 F.2d at 297–99, a battle they cannot possibly win on the basis of the evidence they presented in seeking a preliminary injunction. An even stronger conclusion is possible with regard to their challenge on the ground of "substantive due process." The due process clauses of the Fifth and Fourteenth Amendments forbid govern-

ment to deprive a person of life, liberty, or property without due *process* of law; and if due process is accorded, it is very hard to see how the person can complain about the *substance* of the government's action. So the text is inhospitable to the concept of "substantive due process"; nor does the history of the Constitution support it. Moreover,

> substantive due process has been the foundation of some of the most unsuccessful inventions in constitutional law.... The Supreme Court regularly buries the doctrine, but it just as resolutely refuses to stay dead.... Substantive due process once was used to invalidate legislation affecting prices, wages, and hours, legislation the Court thought struck at the heart of freedom of contract. When enthusiasm for freedom of contract waned, the Court resurrected the same doctrine—with the same lack of textual and historical support—to protect a new constellation of values, this one having to do with family, procreation, and privacy. What unites the many lives of substantive due process is any action "deeply repulsive to the feelings of Supreme Court Justices." ... Substantive due process is a shorthand for a judicial privilege to condemn things the judges do not like or cannot understand. The Constitution does not give such power to judges.

*Gumz v. Morrisette,* 772 F.2d 1395, 1405–06 (7th Cir.1985) (concurring opinion) (citations omitted).

The plaintiffs have brought their case in the wrong era. Chicago's new ordinance indeed strikes at the heart of freedom of contract, but the Supreme Court's current conception of substantive due process does not embrace freedom of contract; a provision once questionably interpreted to guarantee economic freedom is now questionably interpreted to guarantee sexual and reproductive freedom instead. The Court is not about to cut the welfare state down to size by invalidating unreasonable economic regulation such as the ordinance under attack in this case. See, e.g., *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 15–16, 96 S.Ct. 2882, 2892–93, 49 L.Ed.2d 752 (1976). Thus it is clear that the Chicago ordinance does not deny "substantive due process," though not because it is a reasonable ordinance, which it is not.

Clearly, if reasonableness means the same thing in applying the contract clause as in applying the due process clause, the plaintiffs' claim of impairment of contract is also doomed, no matter what evidence they put in at the trial on the merits. Maybe, though, as the outcome in *Spannaus* suggests, it is a somewhat more demanding requirement in the former than in the latter setting. *Spannaus* invalidated a statute apparently aimed at a single company which had closed its plant in the state. Under the company's contract with its employees, the closure of the plant prevented certain pension rights from vesting. The statute required the company to vest those rights anyway. The opinion is narrowly written but may provide a slim ray of hope for the plaintiffs in this case, for it is inconceivable that such a statute would have been invalidated under currently reigning conceptions of substantive due process.

We note finally that for reasons that are obscure the landlords have not raised on this appeal their most promising challenges—that the ordinance violates the commerce clause by requiring landlords to keep tenants' security deposits in Illinois banks and violates the eminent domain clause of the Fifth Amendment (made applicable to the states by another substantive interpretation of the due process clause of the Fourteenth Amendment) by taking away an important part of a landlord's property rights without compensation.